## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------- :

RICHARD ELDERKIN and        :      CIVIL ACTION NO.  3:02CV1474(MRK)
LUIS MAIA        :
       :
     Plaintiffs,        :
v.        :
       :
PATRICK BONA, RICHARD GUISTI, SR., : 
EDWARD C. DEMERS and ROBERT        :
DEVINE        :
       :
     Defendants.        :      APRIL 12, 2004

------------------------------------------------------- :

## <u>DEFENDANTS PATRICK BONA, RICHARD GUISTI, SR. AND EDWARD DEMERS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, the defendants

Patrick Bona, Richard Guisti, Sr. and Edward Demers (the "Middlebury Defendants") respectfully

move for summary judgment on plaintiffs' entire Complaint, based upon the undisputed facts and the

doctrines of qualified and governmental immunity.   As is more fully set forth in the accompanying

Memorandum of Law, Statement of Undisputed Facts, affidavits and supporting documents, the

defendants are entitled to judgment as a matter of law on the plaintiffs' Complaint because the search

of plaintiff Richard Elderkin's property, conducted on September 22, 1999, was done pursuant to a

warrant issued by a neutral magistrate.

359349

In addition, the brief detention and minimal search of Mr. Elderkin, Mr. Maia, and Mr. Maia's vehicle was a legally permissible protective search, incidental to execution of the warrant, and was lawful to ensure that no weapons were present. Moreover, because both plaintiff Richard Elderkin's and Luis Maia's pendant state law claims for intentional infliction of emotional distress are derivative of their legally insufficient federal law claim, the court should decline to exercise supplemental jurisdiction. Even if the Court were to exercise supplemental jurisdiction, the plaintiffs' alleged emotional distress claims do not rise to the level of conduct that is so outrageous as to be actionable. Therefore, the defendants are entitled to summary judgment on the entire Complaint.

**WHEREFORE**, the Middlebury Defendants respectfully request summary judgment on the plaintiffs' entire Complaint.

RESPECTFULLY SUBMITTED,
DEFENDANTS,
PATRICK BONA, RICHARD GUISTI, SR.,
and EDWARD C. DEMERS

By:_____
    JAMES N. TALLBERG, ESQ.
    Fed. Bar No. ct17849
    Updike, Kelly & Spellacy, P.C.
    One State Street, P.O. Box 231277
    Hartford, CT 06123-1277
    Tel. (860) 548-2600
    jtallberg@uks.com

359349

2

## **CERTIFICATION**

I hereby certify that a copy of the foregoing has been sent via U.S. Mail, postage prepaid,

to the following counsel of record, this _____ day of April 2004:

John R. Williams, Esq.
William & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Robert Devine
69 Morris Street
Naugatuck, CT 06770

By:_____
    JAMES N. TALLBERG, ESQ.
    Updike, Kelly & Spellacy, P.C.

359349

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| -------------------------------------------------------- : | | |
| RICHARD ELDERKIN and | : | CIVIL ACTION NO.  3:02CV1474(MRK) |
| LUIS MAIA | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| PATRICK BONA, RICHARD GUISTI, SR., | : | |
| EDWARD C. DEMERS and ROBERT | : | |
| DEVINE | : | |
| | : | |
| Defendants. | : | APRIL 12, 2004 |
| _____ : | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**PATRICK BONA, RICHARD GUISTI, SR. AND EDWARD DEMERS'**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(c), the

defendants Patrick Bona, Richard Guisti, Sr. and Edward Demers (the "Middlebury Defendants")

respectfully submit this memorandum of law in support of their Motion for Summary Judgment.

## I.     INTRODUCTION

The plaintiffs Richard Elderkin and Luis Maia have alleged in this action that they were

subjected to an unreasonable and warrantless search and seizure and that they were unlawfully

arrested.  They allege that this incident was prompted by a false report to the police by co-defendant

Richard Devine, concerning a wooden box of live grenades that were allegedly possessed by Mr.

Elderkin.  In fact, Mr. Elderkin now concedes that he told Mr. Devine he had a box of grenades.  He

claims that it was a joke.  As a result of Mr. Elderkin's purported "joke," the police obtained a

search warrant and conducted a search of Mr. Elderkin's property.  When no grenades were found,

Mr. Elderkin was released.  Neither plaintiff was arrested or physically harmed in any way.  Based

upon the following undisputed facts, the defendants are entitled to summary judgment.

## II.    **FACTUAL BACKGROUND**

### A.    **Plaintiff Richard Elderkin's Alleged Box of Grenades**

On September 22, 1999, Lt. Richard Guisti, Sr. and Officer Edward Demers signed an

Affidavit and Application for Search and Seizure Warrant (the "Warrant") concerning a yellow

ranch style home located at the corner of Umberfield Road and Route 63 in Middlebury,

Connecticut, owned by Richard Elderkin (the "Property").  Exhibit 1 (Affidavit of Richard Guisti,

Sr. of 4/9/04, ¶3 [the "Guisti Aff."]); Exhibit 2 (Affidavit of Edward Demers of 4/9/04, ¶3 [the

"Demers Aff."]).[1]

---

[1] At all times relevant to the complaint in this action, defendant Patrick Bona was the Chief of the Middlebury Police Department, Richard Guisti, Sr. was a Lieutenant, and Edward Demers was an Officer, all acting in their capacity as members of said Department.  Complaint, ¶4; Answer, ¶4. At all times relevant to the complaint in this action, defendant Robert Devine was a private citizen residing in Naugatuck, Connecticut.  Complaint, ¶4, Answer, ¶4.

The Warrant was prompted by information received by the Middlebury Police Department on or about September 20, 1999, from another law enforcement agency, that Mr. Elderkin possessed a case of live pineapple style grenades at the Property. Id., ¶5. This information was based upon a complaint made by Robert Devine. Id., ¶6.

On September 21, 1999, Middlebury Officer Ronald Pruchnicki, Jr., met with Mr. Devine and obtained a sworn written statement claiming that Mr. Elderkin had "live grenades" in the basement of the Property. Id., ¶7. A genuine copy of Officer Pruchnicki's Report, dated September 21, 1999, is attached as Exhibit A to Lt. Guisti's Affidavit. Id., ¶8. A genuine copy of the Statement of Robert Devine, dated September 21, 1999, is attached as Exhibit B to Lt. Guisti's Affidavit. Id., ¶9. Mr. Elderkin was also believed to possess thousands of rounds of military ammunition. Id.

The Application for the Warrant was presented to a Judge of the Connecticut Superior Court at GA4, Judge Iannotti, for his consideration. Id., ¶10. On September 22, 1999, Judge Iannotti considered the Application and signed the Warrant finding that probable cause existed to enter into and search the Property for hand grenades, hand grenade facsimiles, explosives and military explosives. Id., ¶11. A true and genuine copy of the Warrant, a six-page document, is attached as Exhibit A to Officer Demers' Affidavit. Demers Aff., ¶6.

Before the incident that is the subject of this complaint occurred, Mr. Elderkin was acquainted with Mr. Devine.  Exhibit 3 (Deposition of Richard Elderkin of 7/10/03 ["Elderkin Dep."]) at 6-7.  Mr. Elderkin had in the past purchased military-type items from Mr. Devine.  Id.  In fact, in the spring of 1999, Mr. Devine had visited Mr. Elderkin's Property.  Id., at 7.  When Mr. Devine visited the Property, Mr. Elderkin told him that he had live grenades in a box.  Id., at 7, 16.  At that time, Mr. Elderkin had stored there thousands of rounds of various types of ammunition.  Id., at 15.  When Mr. Devine visited the Property, Mr. Elderkin also possessed books that probably covered booby traps.  Id., at 24.

At his deposition, Mr. Elderkin testified as follows:

Q.    Why did you tell Mr. Mancuso and Mr. Devine that you had grenades if you didn't have them?

A.    Why?

Q.    Yes.

A.    Well, it was an ongoing joke with Tom from before.  People, you know . . . We collect things and somebody might say, Oh, that they have a Claymore Mine or they may have a missile launcher, you know, it's just a joke.  It is nothing that, uh, no one took it serious.  People collect things, you know, they talk about stuff.

Q.    Were there any other explosives that you joked about with Mr. Mancuso or Mr. Devine?  Were there any other explosives that you joked about possessing?

A.    No. As far as I know there was nothing.

Q.    Just the grenades?

A.    Yes, as far as I know.

Q.    Who joked about having a missile launcher?

A.    Oh, I forgot what time period you are talking about?

Q.    At some point, did you joke about having a missile launcher?

A.    A missile launcher to Tom.

Id., at 32-33.  See also at 7 and 16 ("I said grenades, live grenades").

**B.    The Execution of the Warrant**

On September 22, 1999, at approximately 6:00 p.m., Mr. Elderkin was stopped on the street by members of a task force consisting primarily of Waterbury Police Officers, who were assisting with the execution of the Warrant.  Guisti Aff., ¶12; Demers Aff., ¶7.  When Lt. Guisti arrived at the scene where Mr. Elderkin was stopped, Mr. Elderkin was already out of the vehicle in which he had been riding as a passenger.  Guisti Aff., ¶¶13-14.  Lt. Guisti, Officer Demers, and Chief Bona did not participate in stopping Mr. Elderkin.  Guisti Aff., ¶¶13-14, 18; Demers Aff., ¶9.  The driver of the vehicle in which Mr. Elderkin had been riding, Luis Maia, was then allowed to drive from the scene.  Guisti Aff., ¶15.  Mr. Elderkin was then transported to the Property.  Guisti Aff., ¶16; Demers Aff., ¶8.

After Mr. Elderkin was brought to the Property, the Warrant was executed with the assistance of members of the task force, including members of the Waterbury Police Department, and the basement of the Property was searched.  No hand grenades were found.  Guisti Aff., ¶17; Demers Aff., ¶10.  It took the police a long time to gain entry into the basement of the Property because it has a specially designed "security door," behind which Mr. Elderkin stores ammunition and weapons.  Elderkin Dep. at 75-76.

Middlebury Police Chief Patrick Bona was not on duty and was not present when Mr. Elderkin was stopped on September 22, 1999.  Guisti Aff., ¶18.  Chief Bona did stop by the Property while the search was being conducted.  Id.  After the search, Mr. Elkerkin gave a voluntary statement to Officer Demers at the Middlebury Police Department, after being notified of his rights.  Guisti Aff., ¶19; Demers Aff., ¶15.  After Mr. Elderkin signed his statement, he was allowed to leave.  Guisti Aff., ¶20; Demers Aff., ¶16.

Mr. Elderkin was not charged with any crime.  Guisti Aff., ¶21; Demers Aff., ¶16.  Mr. Elderkin did not complain of any injuries while he was in the presence of Lt. Guisti or Officer Demers.  Guisti Aff., ¶22; Demers Aff., ¶18.  None of Mr. Elderkin's property was damaged.  Guisti Aff., ¶23.  None of Mr. Elderkin's property was seized.  Guisti Aff., ¶23.

Mr. Elderkin cannot identify which officers ordered him to get out of the vehicle.  Id., at 46-48.  Mr. Elderkin exited the vehicle on his own volition.  Id., at 47 ("And I had my hands extended

and I got out."); <u>see</u> <u>also</u> p. 53.  Mr. Elderkin was ordered to the ground when he got out of the vehicle.  <u>Id.</u>, at 48.  Mr. Elderkin cannot identify which officer it is who he claims pushed him to the ground.  <u>Id.</u>, at 48, 57-58 (Q. "Which officer did this to you?" A. "I am not sure").  No officer punched Mr. Elderkin.  <u>Id.</u>, at 53.  No officer kicked Mr. Elderkin.  <u>Id.</u>

Mr. Elderkin claims that he was forced to the ground and that his left knee hit the grass.  <u>Id.</u>, at 55.  When Mr. Elderkin gave his statement to Officer Demers at the Middlebury Police Department on September 22, 1999, he did not tell him that he hurt his knee.  <u>Id.</u>, at 89.  Mr. Elderkin did not tell the Middlebury Police that he was injured.  <u>Id.</u>  Mr. Elderkin did not seek any medical treatment for his alleged injuries between September 23, 1999 and October 9, 2001.  <u>Id.</u>, at 151.  The Police did not take any property or weapons from Mr. Elderkin's house.  <u>Id.</u>, at 93.

Plaintiff Luis Maia was asked to exit his motor vehicle, a Honda Civic station wagon.  Exhibit 3 (Deposition of Luis Maia of 7/10/03 ["Maia Dep."]) at 16, 18.  Mr. Maia was not handcuffed.  <u>Id.</u>, at 17.  Mr. Maia was not punched, kicked or hit.  <u>Id.</u>  No officer laid hands on Mr. Maia.  <u>Id.</u>  After a quick pat down search, Mr. Maia was allowed to leave.  <u>Id.</u>  The officers opened the doors and looked inside the car, but did not open the hatchback.  <u>Id.</u>, at 19.

Mr. Maia was not arrested and he was allowed to leave within a matter of minutes.  <u>Id.</u>, at 20.  Mr. Maia can recognize Chief Bona and rules him out as definitely not being one of the officers

who allegedly brought Mr. Elderkin to the ground.  Id., at 25.  Mr. Maia has not sought any

counseling as a result of the alleged emotional distress he is claiming from this incident.  Id., at 31.

    **C.**      **The Plaintiffs' Claims**

      This action was commenced by a Complaint dated August 19, 2002.  Although there are two

plaintiffs, the Complaint is not broken down into counts, nor is there really any specific conduct

attributed to any particular defendant.  The Middlebury Defendants are only able to discern in the

Complaint five principal causes of action against them, namely a federal claim under 42 U.S.C. §

1983 for (1) unreasonable search and seizure; (2) warrantless search and seizure (3) false arrest; and

(4) excessive force; and (5) a state law claim for intentional infliction of emotional distress.[2]

      These defendants are entitled to summary judgment because, based upon the undisputed

material facts, the plaintiffs cannot demonstrate a violation of their rights.  Furthermore, these

defendants are shielded by the doctrine of qualified immunity and governmental immunity.

---

[2] During the March 25, 2004 Status Conference regarding this action, there was a discussion of the possible withdrawal of some of the plaintiffs' claims.  Promptly thereafter, defense counsel articulated the basis for this motion to plaintiffs' counsel but was advised, on April 10, 2004, that the plaintiffs seek a "trial on all claims."  Thus, this motion is directed to all claims.

## III.    LEGAL ARGUMENT

### A.    Summary Judgment is Warranted

A motion for summary judgment should be granted if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c); see generally Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970); Cronin, 46 F.3d at 202.

The Second Circuit has ruled, "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion."  Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).  Instead, "*the plaintiff must offer concrete evidence raising genuine disputes of material fact tending to show that his version of events is more than fanciful.*"  Johnson v. Carpenter Technology Corp., 723 F. Supp. 180, 182 (D. Conn. 1989) (emphasis added).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

There are no genuine issues of fact regarding the plaintiffs' claims against the Middlebury Defendants.  The evidence submitted with this Motion establishes that they are entitled to judgment as a matter of law on the Complaint.

**B.**      **The Plaintiffs Cannot Establish a Violation of 42 U.S.C.  §1983**

Section 1983 of Title 42 of the United States Code "provides a remedy for deprivations of rights secured by the Constitutions and laws of the United States . . . "  Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982).  In order to state a claim upon which relief can be granted pursuant to 42 U.S.C. §1983, a plaintiff "must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993).  In addition, a plaintiff must demonstrate that his injuries were proximately caused by the defendants' violation of law.  See Atkins v. New York City, 143 F.3d 100, 103 (2d Cir. 1998).  Based on the undisputed facts, the plaintiffs cannot establish that they were denied a right, privilege or immunity secured by the Constitution or laws of the United States.

### 1.    The Warrant Creates a Presumption of Probable Cause

The issuance of a warrant by a judge creates a presumption of probable cause.  Golino v. City of New Haven, 950 F.2d 864 (2d Cir. 1991).  This presumption can be overcome only by a substantial showing that the officer seeking the warrant "'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause.'"  Csoka v. County of Suffolk, 85 F. Supp. 2d 117, 122 (E.D.N.Y. 2000) (quoting Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993)).

"False imprisonment, or false arrest, is the unlawful arrest by one person of the physical liberty of another."  Outlaw v. City of Meriden, 43 Conn. App. 387, 392 (1996) (quoting Green v. Donroe, 186 Conn. 265, 267, 440 A.2d 973 (1982).  A finding of probable cause, however, is a complete defense to an action for false arrest.  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Zanghi v. Incorporated Village of Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985); Astrada v. Howard, 979 F. Supp. 90, 96 (D. Conn. 1997). "If there existed probable cause at the time of the arrest, the arrest is 'privileged,' and the individual has no constitutional or statutory claim against the officer who made the arrest."  Decker v. Campus, 981 F. Supp. 851, 856 (S.D.N.Y. 1997).

Here, a Judge of the Connecticut Superior Court signed the Warrant, specifically authorizing a search for "hand grenades, hand grenade facsimiles, explosives and military explosives," finding that:

> "there is probable cause for the undersigned to believe that the property described in the foregoing affidavit and application is within or upon the person, if any, named or described in the foregoing affidavit and application, or the place or thing, if any, described in the foregoing affidavit and application, under the conditions and circumstances set forth in the foregoing affidavit and application and that, therefore, a Search and Seizure Warrant should issue for said property."

Warrant of 9/22/99, at 5 of 6.

Moreover, Mr. Elderkin has admitted that he told Mr. Devine that he had "live grenades," in a box in his basement. Elderkin Dep. at 7, 16, 32.[3] Upon these undisputed facts, the Middlebury Defendants are entitled to summary judgment on qualified immunity grounds because their actions were objectively reasonable at the time they were taken. The Middlebury Defendants relied on a signed statement from Mr. Devine, who swore that Mr. Elderkin possessed a box of live grenades. Guisti Aff., ¶6. Plaintiffs cannot possibly prevail on a claim of unlawful or unreasonable search given the undisputed fact that the search was conducted pursuant to a warrant. Therefore, the Middlebury Defendants are entitled to summary judgment on the plaintiffs' unreasonable search and seizure and unlawful arrest claims.

---

[3] The police reasonably believed that possession of these items would violate Connecticut General Statutes §§29-348 and 29-349(c). Warrant at 1 of 6.

Absent a knowing and intentional false statement made with reckless disregard for the truth, the Warrant signed by a neutral magistrate creates a presumption of probable cause and a complete defense to the plaintiffs' claim. Based on these undisputed facts, the Middlebury Defendants are entitled to summary judgment.

> **2.    The Search of Mr. Elderkin, Mr. Maia, and their Brief Detention was a Protective Search Incidental to Execution of the Warrant**

The plaintiffs can be expected to argue that the Warrant did not authorize their being stopped and being briefly detained. This argument is unavailing for several reasons. First, police are authorized to conduct a protective search for their own personal safety when they "have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." United States v. Paolino, 850 F.2d 93, 97 (2d Cir. 1988) (citations omitted). Certainly here, where the officers had a sworn complaint that Mr. Elderkin had a case of live grenades stored in his basement, along with a large cache of military weapons and ammunition, it was objectively reasonable for the police to stop Mr. Elderkin before he holed himself up in his bunker.

Once the police stopped the plaintiffs, it was also objectively reasonable for them to be removed from the vehicle and for the officers to conduct a weapons pat down and a quick scan of the vehicle for weapons. See Maia Dep. at 17. Notably, the police did not open the hatchback of

Mr. Maia's vehicle, nor did they take any of the contents. Id., at 19. As Mr. Maia admitted, he was not arrested and he was allowed to leave within a matter of minutes. Id., at 20. This minimal intrusion, incidental to the execution of a lawfully issued search warrant, does not violate the Constitution. Paolino, 850 F.2d at 97 (denying Motion to Suppress); see also Terry v. Ohio, 392 U.S. 1, 19 (1968) (search for weapons must be limited); United States v. Williams, 181 F.Supp. 267, 279 (S.D.N.Y. 2001) (search of suspect occurring contemporaneously with a lawful arrest does not offend the constitution).

Mr. Elderkin, whose Property was plainly stated on the Warrant as being the subject of the search, has neither standing nor an expectation of privacy regarding the contents of Mr. Maia's automobile. Paolino, 850 F.2d at 97. Mr. Maia, has admitted that he was not handcuffed, was not punched kicked, or hit, and that no officer even laid hands on him. Maia Dep. at 16-18. Thus, under no circumstance consistent with these undisputed facts could Mr. Maia prevail on a claim of excessive force or any of the other legal theories urged in the plaintiffs' complaint. Moreover, while Mr. Maia rules out Police Chief Bona as having violated his rights or even being present where the plaintiffs' vehicle was stopped; see Maia Dep. at 25; Mr. Elderkin cannot identify who it is that he claims violated his rights. Elderkin Dep. at 48, 57-58. Under these facts, the plaintiffs simply cannot meet their burden of proving a constitutional violation by any of the Middlebury

Defendants.  Dwares, 985 F.2d at 98.  Consequently, the Middlebury Defendants are entitled to summary judgment on all counts.

**C.**    **The Middlebury Defendants Are Entitled to Qualified Immunity**

Even if the plaintiffs have stated a claim that their rights were violated, a proposition that the Middlebury Defendants dispute, they are still entitled to qualified immunity.  The qualified immunity defense protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As such, "qualified immunity is an entitlement not to stand trial or face the burdens of litigation."  Id. (internal quotations omitted); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  "The doctrine protects public officials from personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service. It also safeguards the public interest in having its employees act with independence and without fear of consequences."  Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988) (internal quotation and citation omitted).

"Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as the threat of damages, *summary judgment is encouraged as a device for disposing of claims barred by such immunity*."  In Re State Police Litigation, 88 F.3d

111, 123 (2d Cir. 1996) (emphasis added); <u>see</u> <u>also</u> <u>Harlow</u>, 457 U.S. at 818; <u>Behrens v. Pelletier</u>,

516 U.S. 299, 308 (1996); <u>Lee</u>, 136 F.3d at 101; <u>Cartier v. Lussier</u>, 955 F.2d 841, 844 (2d Cir.

1992).  To establish this defense at the summary judgment stage, "the officers must show upon facts

that are undisputed either that their conduct did not violate 'clearly established rights' of which a

reasonable person would have known, or that it was objectively reasonable to believe that their acts

did not violate those clearly established rights."  <u>Soares v. State of Connecticut</u>, 8 F.3d 917, 920 (2d

Cir. 1993) (internal quotations omitted).  A defendant is entitled to summary judgment when "no

reasonable jury looking at the evidence in the light most favorable to, and drawing all inferences

most favorable to, the plaintiffs, could conclude that is was objectively unreasonable for the

defendant to believe that he was acting in a manner that did not clearly violate an established right."

<u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995) (<u>quoting</u> <u>Robinson v. Via</u>, 821 F.2d 913, 921 (2d

Cir. 1987)).

  The defense of qualified immunity shields a police officer from liability for damages on

account of his performance of discretionary official functions if (a) the officer's actions did not

violate clearly established law, or (b) it was objectively unreasonable for the officer to believe that

his actions did not violate such law.  <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).

Accordingly, the first step in evaluating a qualified immunity defense is to determine whether the

plaintiff has alleged a deprivation of a constitutional right at all.  <u>See</u> <u>Connell</u>, 153 F.3d at 80.  Only

if the plaintiff has sufficiently alleged a constitutional violation is it necessary to determine whether the officer, or officers of reasonable competence, believed his actions violated plaintiff's rights. Malloy v. Briggs, 475 U.S. 335, 341 (1986). "Generally, an officer's actions are considered objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." Williams v. Lopes, 64 F. Supp. 2d 37 (D. Conn. 1999) (quotations omitted). Simply stated, the test for qualified immunity is an objective one. See Reese v. Garcia, 115 F. Supp. 2d 284, 295 (D. Conn. 2000).

### 1. The Middlebury Defendants' Conduct was Objectively Reasonable

"The right to be free from arrest or prosecution in the absence of probable cause is a long established right." Ricciutti v. NYC Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997). Based upon the undisputed facts, however, the Middlebury Defendants are entitled to summary judgment on qualified immunity grounds because their actions were objectively reasonable at the time they were taken.

In the context of allegations of false arrest, the Second Circuit has stated that:

> [A]n arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively unreasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.

<u>Golino v. City of New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991) <u>cert. denied</u> <u>sub nom.</u> <u>Lillis v.</u>
<u>Golino</u>, 505 U.S. 1221 (1992).

"If the officer makes either showing, he is entitled to qualified immunity."  <u>Cook</u>, 41 F.3d at
78.  Moreover, in the context of qualified immunity, the defending officer need only show
"arguable" probable cause.  <u>Id.</u>  Arguable probable cause exists when a reasonable police officer in
the same circumstances and possessing the same knowledge as the officer in question could have
reasonably believed that probable cause existed in light of well-established law.  <u>Id.</u> (citations and
quotations omitted).

In this case, it was objectively reasonable for the Middlebury Defendants to believe that they
had probable cause to search Mr. Elderkin's Property.  The Middlebury Defendants took a written
complaint from Mr. Devine, in which he swore that Mr. Elderkin possessed live grenades.  Guisti
Aff., ¶6.  The Middlebury Defendants were also presented with evidence that Mr. Elderkin
possessed thousands of rounds of ammunition.  <u>Id.</u>

Based upon these undisputed facts, reasonable officers could easily conclude that it was
appropriate to present this information to a neutral magistrate, to see if a Judge would agree and
decide that there was probable cause for a Search Warrant to issue.  At the very least, reasonable
officers could disagree about how to proceed.  A Judge of the Connecticut Superior Court agreed

with the Middlebury Defendants and made a specific finding of probable cause.  Exhibit 2B
(Warrant).

Upon obtaining the Warrant, the Middlebury Defendants were entitled to execute it in a
manner that would limit the potential danger to the officers involved in the search.  The decision to
intercept Mr. Elderkin, before he could possibly barricade himself behind the "custom made" steel
door of his storage area, was entirely reasonable under the circumstances confronting the Officers
on September 22, 1999.  Elderkin Dep. at 76.  At the very least, reasonable officers could disagree
on how to proceed.  In any event, as Mr. Elderkin has acknowledged, there were many other
officers present and he cannot attribute any specific actionable conduct to the Middlebury
Defendants.  Id., at 48, 57-58.  Therefore, based on these undisputed facts, the Middlebury
Defendants are entitled to qualified immunity and summary judgment on the plaintiffs' Complaint.

## 2.    The Plaintiffs Cannot Recover Against the Middlebury Defendants for Excessive Force

The Supreme Court has squarely decided that the only source of constitutional protection
against alleged claims of excessive force is the Fourth Amendment.  See Graham v. Connor, 490
U.S. 386 (1988); see also Hughes v. City of Hartford, 96 F. Supp. 2d 114, 115, n.2 (D. Conn. 2000)
(plaintiff withdrew Fourteenth Amendment claim in the face of Motion to Dismiss).  The Second
Circuit Court of Appeals has held that, "[t]he qualified immunity defense is generally available

against excessive force claims." Lennon v. Miller, 66 F.3d at 425, quoting Finnegan v. Fountain, 915 F.2d 817, 222-23 (2d Cir. 1990).

The Supreme Court recently affirmed that, "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 121 S. Ct. 2151, 2155-2156 (2001). "Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.'" Id. (quoting Michell v. Forsyth, 472 U.S. 511, 526 (1985). "The privilege is an immunity from suit rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial…As a result, we repeatedly have stressed the importance of resolving immunity questions at the earliest stage in litigation." Id. (internal quotations omitted);

"To establish an excessive force claim, plaintiff must show that the force used by the officers, in light of the facts and circumstances confronting them, was unreasonable." Williams v. Lopes, 64 F. Supp. 2d 37, 43 (D. Conn. 1999); see Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir. 1990). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. In particular,

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in

> a particular situation.  As in other Fourth Amendment contexts, however, the
> "reasonableness" inquiry in an excessive force case is an objective one: the question is
> whether the officers' actions are 'objectively reasonable' in light of the facts and
> circumstances confronting them, without regard to their underlying intent or
> motivation.

Id. at 396-97 (emphasis added).

Mr. Maia has acknowledged that no officer laid hands on him.  Maia Dep. at 17.  Thus, he

cannot prevail on a theory of excessive force.  Mr. Elderkin, on the other hand, essentially claims

that he was forced to the ground and injured his knee.  Elderkin Dep. at 53-55.  Yet, Mr. Elderkin

has acknowledged that he suffered no visible injuries as a result of this alleged contact.  Elderkin

Dep. at 73.  In addition, he has admitted that he was not punched or kicked, did not suffer any cuts,

and that no weapons were used against him.  Elderkin Dep. at 53.  Finally, he cannot identify who

he claims forced him to the ground.  Id., 48, 57-58.  Based on these facts, no reasonable jury could

conclude that Mr. Elderkin was subjected to unreasonable force by the Middlebury Defendants.

Therefore, they are entitled to summary judgment on the purported excessive force claim.  Graham,

490 U.S. 386.

### D.     The Plaintiffs' State Law Claims Should be Dismissed as they are Derivative of Their Legally Insufficient Federal Claims

Should this Court find that the plaintiffs have failed to establish the requisite elements of

their federal claim, the jurisdictional basis for the plaintiffs' pendent state claim will disappear.

Where a plaintiff pleads a federal cause of action and derivative state law claims in the same

complaint, the state law claims cannot survive a finding that the federal law claim is legally

insufficient.  See Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997); Lennon, 66 F.3d at 426

("Having dismissed the plaintiff's underlying federal claims, we also dismiss her supplemental state

claims of assault, unlawful imprisonment, and malicious prosecution"); A. Aiudi & Sons v.

Plainville, 862 F. Supp. 737, 745 (D. Conn. 1994) (dismissal of claim arising under federal law

obliterated court's subject matter jurisdiction over state law claims); see also Esposito v. Buonome,

647 F. Supp. 580 (1986) (dismissing pendent state law claims on the basis of possible jury

confusion).

        Both Mr. Elderkin's and Mr. Maia's state law claims for intentional infliction of emotional

distress arose from the same factual scenario as their federal claim.  See Complaint, ¶16.

Accordingly, should the court grant summary judgment on the plaintiffs' federal law claim, the

court would lack subject matter jurisdiction over the plaintiffs' state law claim, requiring their

dismissal.  See Monsky, 127 F. 3d. at 247; Lennon, 66 F.3d at 426; A. Aiudi & Sons, 862 F. Supp.

at 745.  Even if the court were to retain jurisdiction over the state law claim, the Middlebury

Defendants are entitled to summary judgment for the following reasons.

        **1.**        **The Plaintiffs Cannot Prevail on Their Intentional Infliction of**
                 **Emotional Distress Claim**

        In order to prevail on the intentional infliction of emotional distress claim, the plaintiff must

allege, and ultimately prove: "'(1) that the actor intended to inflict emotional distress; or that he

359349

22

knew or should have known that emotional distress was a likely result of his conduct; (2) that the

conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the

plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.'"

Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986) (quoting Hiers v. Cohen, 31 Conn.

Supp. 305, 329 A.2d 609 (1973)); Vorvis v. Southern New England Telephone Co., 821 F. Supp.

851, 855 (D. Conn. 1993).

Further, "liability for intentional infliction of emotional distress requires conduct exceeding

all bounds usually tolerated by decent society, of a nature which is especially calculated to cause,

and does cause, mental distress of a very serious kind."  DeLaurentis v. New Haven, 220 Conn. 225,

267, 597 A.2d 807 (1991);  Rennie v. Glass, Molders, Pottery Plastics & Allied Workers

International Union, AFL-CIO, 38 F. Supp. 2d 209 (D. Conn. 1999).

Only where reasonable minds could differ on whether the conduct is "extreme and

outrageous" does it become a question for the jury.  Reed v. Signode Corp., 652 F. Supp. 129, 137

(D. Conn. 1986); Johnson, 918 F. Supp. at 552; Ziobro v. Connecticut Institute for the Blind, 818 F.

Supp. 497, 502 (D. Conn. 1993).  Mere conclusory allegations are insufficient as a matter of law to

support a cause of action for intentional infliction of emotional distress.  Huff, 10 F. Supp. 2d at

122.  The plaintiff must allege and prove "conduct considerably more egregious than that

experienced in the rough and tumble of everyday life."  Whelan v. Whelan, 41 Conn. Supp. 519,

522 (1991).  The standard in Connecticut, which is to demonstrate "extreme and outrageous conduct," is stringent.  Huff, 10 F. Supp. 2d at 122.  Thus, to be actionable the conduct must be found to be "exceeding all bounds usually tolerated by decent society, of a nature."  Mellay v. Eastman Kodak Co., 42 Conn. Supp. 17, 19-20 (1991).

The plaintiffs have alleged nothing that comes close to being extreme or outrageous behavior by the Middlebury Defendants.  In fact, the plaintiffs cannot even identify if it was any of the Middlebury Defendants who allegedly caused them such distress.   Moreover, conduct that is "distressing and hurtful to the plaintiff" is not necessarily extreme and outrageous.  Appleton v. Board of Educ., 254 Conn. 205, 211 (2000).  As a matter of law, therefore, the plaintiffs cannot establish a claim for intentional infliction of emotional distress and the Middlebury Defendants are entitled to summary judgment.

IV.    <u>CONCLUSION</u>

Whether Mr. Elderkin actually possessed grenades or military explosives is immaterial.[4]

The search conducted by the Middlebury Police was preceded by a written citizen complaint, which

lead to a warrant that established there was probable cause to believe that the plaintiff possessed

illegal explosives.  The Middlebury Defendants secured a warrant, signed by a neutral magistrate,

which creates a heavy burden and a presumption of probable cause that the plaintiffs simply cannot

overcome in this case.  Without more, the plaintiffs cannot sustain their claims.

WHEREFORE, the Middlebury Defendants respectfully request that the Court grant their

Motion for Summary Judgment.


RESPECTFULLY SUBMITTED,
DEFENDANTS,
PATRICK BONA, RICHARD GUISTI, SR.,
and EDWARD C. DEMERS


By:_____
JAMES N. TALLBERG, ESQ.
Fed. Bar No. ct17849
Updike, Kelly & Spellacy, P.C.
One State Street, P.O. Box 231277
Hartford, CT 06123-1277
Tel. (860) 548-2600
jtallberg@uks.com

---

[4] See <u>Illinois</u>, 462 U.S. at 245 n.13 ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity").

359349

## CERTIFICATION

I hereby certify that a copy of the foregoing has been sent via U.S. Mail, postage prepaid,

to the following counsel of record, this _____ day of April 2004:

John R. Williams, Esq.
William & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Robert Devine
69 Morris Street
Naugatuck, CT 06770

By:_____
    JAMES N. TALLBERG, ESQ.
    Updike, Kelly & Spellacy, P.C.

359349